UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

JOHN DOE,                                §
                                         §
        *Plaintiff,*                     §
                                         §        Civil Action No.  6:22-cv-1155
v.                                       §
                                         §
BAYLOR UNIVERSITY,                       §
                                         §
        *Defendant.*                     §

## COMPLAINT AND JURY DEMAND

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP, and Borsellino, P.C., as and for his complaint against Defendant Baylor University ("Baylor" or the "University") respectfully alleges as follows:

## THE NATURE OF THE ACTION

1.      This action arises out of the intentional, discriminatory, and biased actions occasioned by Baylor throughout the University's Title IX sexual misconduct investigation, which resulted in Plaintiff's wrongful and erroneous expulsion from the University.

2.      Baylor engaged in a sloppy and flawed investigation and adjudication that was plagued with procedural flaws and inconsistent evidence, resulting in an erroneous finding of responsibility.

3.      On information and belief, Baylor undertook the investigation having already perceived Plaintiff responsible in the University's attempt to prove that it aggressively pursues sexual misconduct complaints made against males in order to appease upset students and to avoid recission of federal funding.

---

[1] Plaintiff has filed a motion herewith to proceed by pseudonym.

1

4.      Despite the fact that fellow student Jane Roe[2] actively planned for days via messages to have a sexual encounter with Plaintiff, Roe later brought forth a complaint against Plaintiff for sexual assault, although declined to have the matter investigated.

5.      It was not until nearly one year later that Roe requested that the matter be formally investigated.

6.      Throughout the investigation, Roe contradicted her allegations with her own statements, demonstrating the falsity of her complaint.

7.      Nevertheless, the University accepted Roe's statements at face value and without corroborating evidence.

8.      Notwithstanding the utter lack of evidence to find Plaintiff responsible, Plaintiff was painted guilty as a male accused and Roe was presumed truthful and credible as the female complainant.

9.      As a result of the University's biased and flawed procedures, Plaintiff was found responsible for sexual assault, and was sanctioned to expulsion from the University, completely derailing his future educational and career prospects.

10.      By employing a gender-based presumption of Plaintiff's guilt, and by imposing an unreasonable sanction, Defendant displayed anti-male discriminatory bias in violation of Title IX of the Education Amendments of 1972.

11.      By violating its own policies and depriving Plaintiff of a fair and impartial disciplinary process, Defendant breached express and implied agreements with Plaintiff and acted in bad faith in failing to fulfill its promises to him as an enrolled student paying tuition at Baylor.

12.      Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

---

[2] Jane Roe is a pseudonym.

## THE PARTIES

13.     Plaintiff is a natural person and a resident of Texas. During the events described herein, Plaintiff was enrolled as a fulltime, tuition-paying, undergraduate student at Baylor.

14.     Defendant Baylor is a partially federally funded private university located in Waco, Texas, where it maintains its principal offices and place of business.

## JURISDICTION AND VENUE

15.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims as to form the same case controversy under Article III of the United States Constitution.

16.     This Court has personal jurisdiction over Defendant Baylor on the ground that it is conducting business within the State of Texas.

17.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.     BACKGROUND**

**A.     The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints.**

18.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

19.     The DCL advised recipients that sexual violence constitutes sexual harassment

within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

20.      The OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11).

21.      Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

22.      On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies and advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf OCR's April 2014 at 31.

23.      In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. Id. at 25-31.

24.      In the same month that the OCR issued its April, 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at*

https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.    The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

25.    To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited June 7, 2020).

26.    Colleges and universities, including Baylor, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the DOJ. In response to pressure from OCR and DOJ, educational institutions, like Baylor, have limited procedural protections afforded to males, like the Plaintiff, in sexual misconduct cases.

**B.    The 2017 Revocation of the DCL.**

27.    On September 22, 2017, the OCR formally rescinded the DCL and the April, 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A    on    Campus    Sexual    Misconduct* (Sept.    2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

28.    In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most

basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*." Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), [https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf](https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf). (citations omitted) (emphasis added).

29.    The 2017 Q&A suggests that the policies and procedures in place at Baylor at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

30.    On information and belief, despite the sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, Baylor did not change its Title IX procedures.

### C.    The 2020 Title IX Final Rule

31.    On May 6, 2020, the Department of Education released new Title IX regulations, which amended the Code of Federal Regulations for Nondiscrimination on the Basis of Sex in Education for Programs or Activities Receiving Federal Financial Assistance (the "2020 Title IX Final Rule") which carry the force and effect of law as of August 14, 2020. ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html).

32.    The 2020 Title IX Final Rule replaced all previously issued OCR guidance, including the rescinded 2001 Title IX Revised Sexual Harassment Guidance.

33.    The 2020 Title IX Final Rule provides respondents with procedural rights which the Plaintiff was deprived of during his own disciplinary proceeding, including the right to a live hearing with cross-examination of all witnesses. (*See* "Summary of Major Provisions of the

Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf).

34.     In light of the 2020 Title IX Final Rule, Baylor updated its Title IX Policy as of August 2020.

**D.     Baylor's History of Mishandling Title IX Claims**

35.     Between 2012 to 2016, Baylor failed to properly investigate allegations of sexual assault made by female students against male members of its NCAA Division I football team.

36.     Baylor faced widespread criticism for its mishandling of these allegations.

37.     The OCR opened an investigation related to Baylor's mishandling of these allegations on October 18, 2016.

38.     In 2015, responding to the public revelation that it had routinely mishandled sexual misconduct cases, Baylor hired Pepper Hamilton to conduct an internal investigation of its Title IX procedures.

39.     In 2016, Pepper Hamilton issued a report that found that Baylor failed to effectively implement Title IX.

40.     The Pepper Hamilton report included more than 100 recommendations to address Baylor's Title IX deficiencies.

41.     One of Pepper Hamilton's recommendations was for Baylor to provide more support for victims of sexual assault.

42.     In 2016, Baylor issued the "Baylor University Board of Regents Findings of Fact," which acknowledged Pepper Hamilton's recommendations and stated, "The University has taken and will take additional steps to address the deficiencies noted in the findings of fact."

43.     Since 2016, Baylor was sued at least 11 times by alleged female victims of sexual

assault for its failure to properly investigate their claims.

      **E.**      **Baylor Responds to Public Shaming and Pressure By Instituting A Culture of Anti-Male Bias**

      44.      In an April 10, 2013 article in the Baylor Lariat titled "Alumna to speak on sexual assault, hope to open eyes," Baylor associate professor of religion Dr. Jonathan Tran noted, "Usually with sexual assault the emphasis is put on women and how they can protect themselves, putting all the responsibility on them. . . .Whereas the emphasis should be put on men learning respect."

      45.      In a September 6, 2013 article in the Baylor Lariat titled "Baylor implements new sexual assault prevention campaign," Dr. Cheryl Wooten, staff psychologist at the Baylor Counseling Center stated, "Assaults tend to happen on campuses where there are stereotypical gender roles. . . .If [assaults] are strictly defined where men have more power in relationships, there will be an increase in number of sexual assaults."

      46.      Dr. Wooten further noted, "I think as a community if we all agree to be watching, could we catch some of these guys? I think so."

      47.      On April 23, 2015, Baylor's Office of Community Engagement & Service and the Title IX Office held a discussion on sexual assault prevention for all males on campus.

      48.      The purpose of the April 23, 2015, discussion led by Ian McRary, Baylor's Title IX officer from February 2015 to January 2016, was to educate Baylor's male student population on how to prevent sexual assault.

      49.      "It's On Us" was launched by the White House Task Force to Prevent Sexual Assault in September 2014 to combat sexual assault on college campuses by engaging young men and changing campus culture.

      50.      "It's On Us at Baylor" is a student-run group dedicated to fighting sexual violence

at Baylor.

51.     Baylor endorses the activities of "It's On Us" and "It's On Us at Baylor."

52.     In April 2016, Baylor sponsored the "It's On Us Pledge Drive."

53.     The description of the It's On Us Pledge Drive stated, in part, "Students, faculty and staff are encouraged to take the It's On Us pledge."

54.     Baylor also permits "It's On Us" and "It's On Us at Baylor" to place posters on its campus.

55.     The "It's On Us" and "It's On Us at Baylor" posters displayed in Baylor's bathrooms exclusively portray men as perpetrators.

56.     The "It's On Us at Baylor" Twitter page includes tweets advocating that rapists should be "castrated."

57.     The "It's On Us at Baylor" Twitter page also includes tweets stating that "Rape is caused by misogyny, not by women's clothing."

58.     In 2016, Baylor officials in spiritual life, multicultural affairs, and the counseling center collaborated to form Men for Change, an organization comprised of both Baylor staff members and students that offers presentations, panel discussions and mentoring sessions on the topics of active spirituality, healthy relationships, and masculinity.

59.     Josh Ritter, Baylor's Assistant Director of Spirituality and Public Life, has stated that the purpose of Men for Change is to shed light on sexual assault and toxic masculinity. *See* Phillip Ericksen, *Baylor's Men for Change confronts toxic masculinity, harmful stereotypes*, Waco Tribune (Jan. 28, 2019).

60.     Ritter noted that Men for Change is "really interested in disrupting this power dynamic that says that men are supposed to be powerful and dominant over women, which is not

OK." *Id.*

61.     David Copeland, a Baylor staff member who works in the Department of Health, Human Performance and Recreation, said that Men for Change is "pretty supportive of the message that is being presented, with men being accountable to other men and calling men to be something more, something better." *Id.*

62.     On November 13, 2017, Baylor's Office of Diversity and Inclusion hosted a This Matters Panel focused on #MeToo (the "#MeToo Panel").

63.     The #MeToo Panel was held in the Barfield Drawing Room, one of the larger and most central venues on campus.

64.     The purpose of the #MeToo Panel was to discuss how Baylor can reform the perceived stigma and mentality surrounding sexual and interpersonal violence.

65.     One of the #MeToo Panel members was Dr. Mito Diaz-Espinoza, program manager for Baylor's First in Line program.

66.     During the event, Diaz-Espinoza stated, "One of the things to really push change is to change the culture of men. It's said that it's better to raise healthy boys than to fix broken men." *See* Phoebe Suy, *Panel says 'interpersonal violence is everyone's issue'*, Baylor Lariat (Nov. 14, 2017).

67.     He further noted, "[Men] should start understanding that the actual physical and emotional violence that they're perpetrating against others is what [they] need to face." *Id.*

68.     Baylor's 2018 Annual Fire Safety and Security Report uses the term "victim" 95 times.

69.     Baylor faculty members are required to take and pass short online courses, trainings on sexual violence, harassment, and civil rights.

70.     These courses exclusively portray males as perpetrators and women as victims.

71.     Moreover, on information and belief, in 2020 while Plaintiff's investigation was pending, Baylor sent a letter out informing others of the University's Title IX policy of expelling students with Title IX allegations against them, without considering the individual facts of the case.

72.     Baylor's history and the statements of University officials demonstrates the anti-male bias that is perpetuated throughout campus and infected the disciplinary proceedings against Plaintiff.

**F.     The alleged incident**

73.     Plaintiff matriculated to Baylor in the Fall of 2020, with an expected graduation date of Spring 2024.

74.     On October 19, 2020, Plaintiff matched on the dating app Tinder with another first-year Baylor student, Jane Roe.

75.     Plaintiff and Roe messaged back and forth for five consecutive days until October 23, 2020.

76.     Much of Plaintiff and Roe's conversations consisted of discussing when they would meet up and have sexual intercourse.

77.     For example, Roe asked Plaintiff if Plaintiff would tell his roommates to leave when she came over.

78.     On October 23, 2020, Roe messaged Plaintiff on the app asking Plaintiff when he was free and if he had a condom.

79.     Plaintiff and Roe agreed to meet up later that night in front of the Judge Baylor statue, and then go back to Plaintiff's dorm room.

80.     While in Plaintiff's dorm room, Plaintiff and Roe sat on Plaintiff's bed talking for about 30 minutes.

81.     Plaintiff and Roe then began to mutually kiss each other for a few minutes.

82.     Plaintiff asked Roe if she wanted Plaintiff to perform oral sex on her, and Roe said yes.

83.     Plaintiff proceeded to engage in oral sex with Roe for three to four minutes.

84.     Roe then voluntarily gave Plaintiff oral sex for a few minutes.

85.     Plaintiff asked Roe if she wanted to have sexual intercourse, and Roe affirmatively said yes.

86.     Plaintiff then retrieved a condom and he and Roe engaged in vaginal intercourse for four to five minutes.

87.     Roe did not at any point during the sexual acts say no or otherwise indicate that she wanted to stop. Rather, Roe was an active and willing participant.

88.     Afterwards, Roe got dressed, hugged Plaintiff goodbye, and left.

89.     When Roe left Plaintiff's apartment, she was in good spirits. Roe was not crying and did not appear distressed.

90.     Plaintiff and Roe did not speak after that night.

**G.     The aftermath of the incident**

91.     After Roe left Plaintiff's apartment, she called her friend, S.T. and told her that she had been sexually assaulted.

92.     On information and belief, Roe claimed that she had been assaulted because she had regretted the casual sexual encounter with Plaintiff.

93.     On the afternoon of October 24, 2020, Roe went to Baylor Scott and White

Hillcrest's emergency room for a sexual assault exam ("SAFE exam").

94.    Roe claimed that her visit to the emergency room was due to an "unplanned sexual encounter," despite the fact that Roe's messages to Plaintiff prior to the encounter clearly demonstrated an intent to have sexual intercourse.

95.    Moreover, Roe requested a SAFE exam, but stated that she did not want to contact the police.

96.    Roe claimed that Plaintiff had penetrated her mouth and vagina without consent and choked her without consent.

97.    The form that Roe filled out for the SAFE report, however, was inconsistent with her account, as she noted on the form that she was "not sure" if she performed oral sex on Plaintiff.

98.    Notably, the nurse noted that Roe had *bite/suction* marks on her neck, but did not note any bruises from choking abrasions.

99.    On October 25, 2020, Roe went to the University's Police Department ("BUPD") and reported the alleged sexual acts.

100.   Roe noted in her BUPD interview that she did not wish to pursue a disciplinary investigation.

101.   Plaintiff did not submit a formal complaint until *nearly one year later*, when she submitted a signed complaint to the Equity Office requesting an investigation on July 13, 2021.

102.   Baylor then issued a notice of investigation to Plaintiff via email on July 14, 2021, that stated that Roe had alleged that Plaintiff sexually assaulted her by kissing Roe without consent, penetrating Roe's mouth without consent, penetrating Roe's vagina without consent, and penetrating Roe's vagina with his fingers without consent.

103.   The letter stated that Plaintiff was also under investigation for dating violence for

strangling Roe.

104.    Melissa Morie ("Morie") was subsequently appointed as the Title IX Investigator for the case.

105.    Throughout the investigation, Roe was interviewed three times, on July 13, 2021, August 19, 2021, and September 3, 2021.

106.    Plaintiff, however, was only interviewed twice, on August 9, 2021 and August 26, 2021.

107.    The investigator also interviewed S.T. and Plaintiff's roommate, D.V, as witnesses.

108.    Morie subsequently issued the Preliminary Investigation Report that contained the witness statements.

109.    In response, Roe submitted a statement from her psychologist, who stated that Roe had gone to him on October 26, 2020 and claimed that she had been sexually assaulted over the weekend.

110.    Morie produced the Final Investigative Report on October 4, 2021.

111.    The Final Investigative Report included, at Roe's request, the statement from her psychologist.

112.    Plaintiff submitted a response to the Final Investigative Report in which he included screenshots of Roe's profile on the dating app Bumble, demonstrating that Roe was clearly not as traumatized as she claimed from the experience as she had regularly been using dating apps following the alleged incident.

113.    Despite Plaintiff's request, Plaintiff's provided information was not included in the Investigative Report and was not considered by the decision maker, unlike the information that Roe provided in response to the Preliminary Investigative Report.

114.    The University held a hearing for the matter on October 18, 2021.

115.    Roe attended the hearing with a University-appointed advisor, Christian Jeong.

116.    However, Plaintiff had discussed the allegations with Jeong previously, and accordingly, Jeong had a conflict of interest in serving as Roe's advisor.

117.    Indeed, Jeong knew privileged information about the matter that Plaintiff had previously told her, which gave Roe a prejudicial advantage when Jeong cross-examined Plaintiff at the hearing.

118.    Moreover, during cross examination, the Hearing Officer, Peter Lim ("Lim"), precluded Plaintiff's advisor from asking Roe any questions concerning her continued use of dating apps following the alleged incident, although the questions went directly to Roe's credibility regarding her trauma.

119.    Notably, S.T., the very witness which Roe allegedly told about the incident immediately following the encounter, did not attend the hearing because she did not wish to participate.

120.    Incredibly, on information and belief, Roe messaged Plaintiff's high school girlfriend *during* the hearing asking her if Plaintiff ever sexually assaulted her because she "needed a stronger case."

121.    On November 1, 2021, Lim issued a decision, finding Plaintiff responsible for sexual assault and sanctioned Plaintiff to expulsion.

122.    Lim's 17-page decision and analysis made every effort to minimize the inconsistencies presented by Roe throughout the investigation and to highlight any missteps made by Plaintiff.

123.    For example, Lim stated that, among other things, he found Roe to be credible due

to (1) Roe's close-in-time disclosure to S.T. and (2) Roe's demeanor when conversing with S.T.

124.    However, the only person that could testify to Roe's demeanor and disclosure would have been S.T. herself, *who declined to participate at the hearing*.

125.    Without being subject to cross-examination, there was no way for Lim to make a proper credibility assessment of S.T. and thus S.T. had only made statements which were transcribed in the Investigation Report.

126.    Accordingly, Lim considered and gave weight to S.T.'s statements, despite the fact that she was not subject to cross-examination, and in violation of Baylor policy.

127.    Additionally, Lim also stated that he found Roe to be credible due to the fact that she sought medical treatment and a SAFE exam the day after the alleged incident.

128.    However, Lim explicitly acknowledged that the form filled out by Roe at the time of the SAFE exam *contradicted the allegations that she made against Plaintiff*. Incredibly, Lim stated that despite Roe's own contradictory statements, he still deemed her credible.

129.    Likewise, Lim declined to acknowledge that Roe made inconsistent statements to the SAFE nurse, as she claimed that Plaintiff started choking her while kissing Plaintiff when she spoke to the nurse but stated to the University that Plaintiff choked her only during intercourse, after kissing.

130.    Lim also stated that Roe's allegations of strangling were consistent with Roe's medical examination, but in fact, the medical examination confirmed *bite/suction* marks, not strangulation marks.

131.    On the other hand, Lim spent about three pages explaining why Plaintiff merely not stating that he performed oral sex on Roe at the first meeting made Plaintiff incredible.

132.    However, Plaintiff explained that performing oral sex on Roe was not at issue

regarding consensual acts, and that he left out the detail because he thought that the only issues were regarding penetration and strangulation, as stated in the notice of allegations.

133.    Despite the plethora of inconsistencies in Roe's statements, Lim latched onto this single collateral detail that Plaintiff had left out in the initial meeting, but then noted in a later interview, as amounting to enough to find Plaintiff incredible.

134.    Plaintiff timely appealed the decision and sanction on November 9, 2021.

135.    Plaintiff's appeal noted that there was a new letter from one of his other roommates detailing the roommate's interactions and dating with Roe through dating apps, as well as the conflict of interest with Roe's advisor given the fact that Plaintiff had discussed the issue with the advisor previously.

136.    On November 23, 2021, Sandra Lauro, the Appellate Officer, denied Plaintiff's appeal on all grounds.

137.    Plaintiff has exhausted all available avenues for appeal under Baylor's policies. This lawsuit represents Plaintiff's only hope to redress the wrongs occasioned by Defendant.

**H.    Roe Stalks Plaintiff's Friends**

138.    Disturbingly, on information and belief, during the investigation and following the Title IX outcome, Roe, despite her claims of being traumatized, has gone out of her way to stalk Plaintiff's current girlfriend and friends.

139.    Indeed, Roe has followed both Plaintiff's current girlfriend and ex-girlfriend on social media.

140.    Worse, Roe has appeared outside of Plaintiff's current girlfriend's apartment numerous times.

141.    On information and belief, Roe went as far as to damage Plaintiff's current

girlfriend's car.

142.    Roe has also directly asked Plaintiff's ex-girlfriend and friends questions as to Plaintiff's whereabouts.

143.    As a result of Roe's stalking, Plaintiff's current girlfriend filed a police report and obtained a protective order against Roe on or around January 19, 2022.

144.    Plaintiff's current girlfriend also filed a Title IX report against Roe on or around January 19, 2022.

145.    Incredibly, the University almost immediately dismissed the Title IX stalking complaint against Roe and declined to investigate the matter, leaving both Plaintiff and his acquaintances in danger.

## II.    AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT BAYLOR

146.    Upon Plaintiff's matriculation to Baylor, Plaintiff and Baylor became mutually bound by Baylor's Sexual and Interpersonal Misconduct Policy (the "Policy"), which is the applicable policy for Baylor's Title IX procedures.

147.    On information and belief, the Policy is updated and/or revised each new school year.

148.    The Policy and/or the various provisions contained therein are available online through the Baylor website.

149.    In response to local and federal pressure for failing to protect female accusers or take a strong stance against sexual assault against males, Baylor applied the Policy in a manner that, on information and belief, resulted in harsher penalties for males accused of sexual

misconduct as compared to females.[3]

150.   The Policy contains and represents a contract between students and the University and, in particular, between Plaintiff John Doe and Defendant Baylor.

151.   Throughout the Title IX process in this case, Defendant breached its contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policy and the processes set forth therein, and by permitting gender bias to infect and taint the proceedings, resulting in erroneous outcome.

152.   The Policy states that "[d]eterminations regarding responsibility by hearing officers… will be made by a preponderance of the evidence. A preponderance of the evidence means that based on all relevant evidence and reasonable inferences from the evidence, the greater weight of information indicates that it was more likely than not the alleged policy violation occurred."

153.   The University breached the Policy by failing to properly apply the preponderance of the evidence standard. Lim categorically ignored the numerous inconsistencies in Roe's statements which directly affected Roe's credibility. Given Roe's lack of evidence and credibility concerns, there was no preponderance of the evidence to find Plaintiff responsible.

154.   According to the Policy, "[i]n cases that will be investigated, the Title IX Coordinator will appoint one or more investigators (referred to in this policy as "the investigator") to conduct a prompt, thorough, fair, and impartial investigation."

155.   The University breached this Policy because the Investigator failed to conduct a thorough and fair investigation. Indeed, by way of example, and not limitation, Plaintiff was

---

[3] Baylor has not published statistics concerning the outcomes of sexual misconduct proceedings, including the gender of respondents who were sanctioned as a result thereof. This is information that Plaintiff intends to seek in discovery.

precluded from introducing information regarding Roe's activity on dating apps that would directly impact Roe's alleged trauma and her credibility.

156.    The Policy states that "[t]he burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the University and not on the parties."

157.    The University breached the Policy by placing the burden on Plaintiff. Despite her contradictory statements, Roe's story was taken at face value, and Plaintiff was presumed responsible unless he could disprove Roe's allegations, given the complete lack of evidence collected by the University to substantiate Roe's allegations.

158.    The Policy states that "[p]arties will have an equal opportunity to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence."

159.    The University breached the Policy because Roe and Plaintiff were not given the same opportunity to present evidence to be included in the Investigation Report and considered by the Hearing Officer. Indeed, when Roe requested that a letter from her psychiatrist be included, the Investigator included the statement in the Investigative Report. However, when Plaintiff requested that Roe's recent activity on dating apps be included, the University declined to include the information in the Investigative Report, despite its relevance to Roe's alleged trauma.

160.    According to the Policy, "[i]f a party or witness does not submit to cross-examination at the live hearing, the hearing officer will not rely on any statement of that party or witness in reaching a determination regarding responsibility."

161.    The University breached the Policy by relying on S.T.'s statements throughout the investigation in rendering a decision and finding Roe credible, despite the fact that S.T. refused to appear at the hearing and did not submit to cross-examination.

### III.   PLAINTIFF'S DAMAGES

162.    As a direct and proximate result of Defendant's biased, illegal, and improper conduct, an erroneous finding that Plaintiff engaged in nonconsensual sexual contact has been made a part of Plaintiff's educational records and a notation has been made on his transcript. These records may be released to educational institutions and employers to whom Plaintiff applies, substantially limiting his ability to gain acceptance to another school or to secure future employment. Roe's allegations painted Plaintiff as a dangerous sex criminal, wiping out a lifetime of hard work towards his college education and future career prospects.

163.    By improperly expelling Plaintiff and placing a notation on his transcript, Baylor has damaged Plaintiff's future education and career prospects. Specifically, as a result of Baylor's actions, Plaintiff will be forced to disclose and explain to potential employers and any undergraduate or graduate school to which he may opt to apply that he was disciplined by Baylor for sexual misconduct.

164.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which destroyed his reputation and will permanently impact his future education and career prospects.

165.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

166.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault.

167.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of sexual assault, and the sanction is listed on Plaintiff's transcript.

168.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damages to his future educational and career prospects.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972**
**Erroneous Outcome**

169.     Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

170.     Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

171.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Baylor.

172.     Baylor receives federal funding, including in the form of federal student loans given to students and is subject to the provisions of Title IX.

173.     Title IX is enforceable through a private right of action.

174.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

175.     Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

176.    Baylor engaged in gender bias in its Title IX proceedings. Plaintiff was innocent and wrongly found to have committed a violation of Baylor's policies, and gender bias was a motivating factor.

177.    Baylor failed to conduct an adequate, reliable, and impartial investigation of Roe's complaint because, by way of example and not limitation:

>   a.    Failing to provide Plaintiff and Roe equal opportunities to present exculpatory information;
>
>   b.    Refusing to  include Plaintiff's information regarding Roe's use of dating apps in the Investigative Report;
>
>   c.    Failing to include a proper transcription of Plaintiff's interview in the Investigative Report;
>
>   d.    Failing to ask Roe questions that would negatively impact her credibility, including those concerning her alleged trauma following the event;
>
>   e.    Considering S.T.'s statement in rendering a determination of responsibility, despite the fact that S.T. did not appear at the hearing and was not subject to cross-examination;
>
>   f.    Allowing Roe to have a University advisor, who would cross-examine Plaintiff, that Plaintiff had previously spoken to in confidence about the events;
>
>   g.    Taking Roe's statements at face value, despite an utter lack of corroborating evidence and numerous contradictory statements;
>
>   h.    Failing to properly apply the preponderance of the evidence standard, considering the lack of evidence concerning the allegations;
>
>   i.    Defendant's refusal to apply the particular facts of the case in considering the appropriate sanction, including the fact that Plaintiff had remained on campus throughout the investigation and thus posed no threat to campus

178.    Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous finding and the decision to impose an unduly harsh sanction upon Plaintiff. These circumstances include, by way of example and not limitation:

a.   The pressure imposed by the 2014 OCR resolution, including the fear of loss of federal funds as well as the fear of added financial liability such as reimbursing tuition for aggrieved students if the University was not compliant;

b.   Internal pressure from the student body and/or media to aggressively pursue complaints of sexual misconduct against males and to believe all women in cases of sexual assault regardless of the evidence;

c.   Defendant's refusal to conduct any genuine investigation that could reveal exculpatory evidence, for example, failing to consider evidence that demonstrated that Roe was not as traumatized as she claimed;

d.   Defendant's failure to afford Plaintiff and Roe the same opportunity to submit information;

e.   Defendant's distortion of the evidence and Plaintiff's statements to fit Roe's narrative, rather than impartially evaluating the facts of the case; and

f.   Painting Plaintiff, the male respondent, as less credible than Roe, the female complainant.

179.   On information and belief, Baylor's mishandling of the complaint was informed by institutional pressure, ongoing OCR investigations into noncompliant universities, and the threat of recission of federal funds.

180.   On information and belief, Baylor has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against non-male students.

181.   Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

182.   This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential

damages.

183.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Baylor to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original finding and sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

### AS AND FOR A SECOND CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972**
**Selective Enforcement**

184.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

185.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

186.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Baylor.

187.    Baylor receives federal funding, including in the form of federal student loans given to students and is subject to the provisions of Title IX.

188.    Title IX is enforceable through a private right of action.

189.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action

which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

190.    To succeed on a selective enforcement claim, a plaintiff must demonstrate that gender was a motivating factor in the decision to initiate a disciplinary action and/or the severity of the punishment.

191.    Selective enforcement occurred in this case because Plaintiff's gender was a motivating factor in Baylor's decision to initiate proceedings against Plaintiff.

192.    Baylor selectively enforced its Policy as between similarly situated male and non-male students. By way of example and not limitation:

  a. Plaintiff and Roe were similarly situated in that both students were accused of conduct that could constitute a violation of the Policy. Namely, Plaintiff was accused of Title IX sexual assault and Roe was accused of Title IX stalking. However, Baylor prosecuted Plaintiff to the fullest extent, whereas the stalking claims against Roe were ignored, discouraged, and dismissed;

  b. The stalking claims against Roe specifically arose after and as a result of Roe's allegations against Plaintiff. Despite the related instances, the University failed to investigate Roe, indicating a general pattern and practice of not prosecuting claims against non-male students; and

  c. Roe was presumed credible from the start and Plaintiff was presumed guilty from the start.

193.    Particular circumstances suggest that gender bias was a motivating factor behind Baylor's selective enforcement of the Policy. These circumstances include, by way of example and not limitation:

  a. The pressure imposed by the 2014 OCR resolution, including the fear of loss of federal funds as well as the fear of added financial liability such as reimbursing tuition for aggrieved students if the University was not compliant;

  b. Internal pressure from the student body and/or media to aggressively pursue complaints of sexual misconduct against males and to believe all women in cases of sexual assault regardless of the evidence;

c.  Defendant's refusal to conduct any genuine investigation that could reveal exculpatory evidence, for example, failing to consider evidence that demonstrated that Roe was not as traumatized as she claimed;

d.  Defendant's failure to afford Plaintiff and Roe the same opportunity to submit information;

e.  Defendant's distortion of the evidence and Plaintiff's statements to fit Roe's narrative, rather than impartially evaluating the facts of the case; and

f.  Painting Plaintiff, the male respondent, as less credible than Roe, the female complainant.

194.  On information and belief, Baylor has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students, while not making comparable efforts with respect to sexual and/or dating violence/stalking made against female/non-male students.

195.  Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

196.  This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

197.  As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Baylor to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original finding and sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

## AS AND FOR A THIRD CAUSE OF ACTION
**Breach of Contract**

198.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

199.    At all times relevant hereto, a contractual relationship existed between Plaintiff and Baylor through Baylor's dissemination of the policies and procedures governing the student disciplinary system, including but not limited to the Policy, and Plaintiff's tuition payments and other consideration, such as compliance with the University's relevant policies.

200.    Baylor committed numerous breaches of its agreements with Plaintiff during the investigation and adjudication of Jane Roe's allegations against him, including but not limited to:

      a.    Failing to properly apply the preponderance of the evidence standard;

      b.    Failing to conduct a fair and impartial investigation;

      c.    Placing the burden of proof on Plaintiff;

      d.    Failing to give Plaintiff and Roe the same opportunity to present information for the Investigative Report; and

      e.    Considering S.T.'s statements even though she did not appear at the hearing and was not subject to cross-examination.

201.    Further, included in these contractual agreements is the covenant of good faith and fair dealing implied in all contracts.

202.    Baylor breached the covenant of good faith and fair dealing implied in the Policy. Examples of such breach include, but are not limited to:

      a.    Claiming that Plaintiff's information concerning Roe's use of dating apps was irrelevant despite the fact that it went directly to Roe's credibility;

      b.    Allowing Roe's campus advisor to be one that Plaintiff had previously spoken to in confidence;

      c.    Refusing to allow Plaintiff to question Roe about her dating activity after

the alleged incident at the hearing;

    d.      Finding Plaintiff not credible because of one forgotten detail, while finding Roe credible notwithstanding her numerous inconsistent statements; and

    e.      Implementing an unduly harsh sanction given the facts of the case and failing to consider that Plaintiff did not pose a threat to campus as he had remained a student throughout the investigation and adjudication of the complaint.

203.    As a proximate and foreseeable consequence of the foregoing, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

204.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendant as follows:

    (i)      On the first cause of action for Violation of Title IX of the Education Amendments of 1972 Erroneous Outcome, a judgment against Baylor awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Baylor to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

    (ii)      On the second cause of action for Violation of Title IX of the Education Amendments of 1972 Selective Enforcement, a judgment against Baylor awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Baylor to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); and (iv) issue

an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(iii)      On the third cause of action for Breach of Contract, a judgment against Baylor awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)      Equitable relief in the form of an order directing Defendant to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(v)       Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

**Dated:   New York, New York**
**          November 4, 2022**

                              **Respectfully submitted,**

                              **Nesenoff & Miltenberg, LLP**
                              *Attorneys for Plaintiff John Doe*

                              By: */s/ Andrew T. Miltenberg, Esq.*
                                 Andrew Miltenberg, Esq.
                                 *(pro hac vice pending)*
                                 Stuart Bernstein, Esq.
                                 *(pro hac vice pending)*
                                 Kristen Mohr, Esq.
                                 *(pro hac vice pending)*
                                 363 Seventh Avenue, 5th Floor
                                 New York, New York 10001
                                 212-736-4500 (telephone)
                                 212-736-2260 (fax)
                                 amiltenberg@nmllplaw.com
                                 sbernstein@nmllplaw.com
                                 kmohr@nmllplaw.com

**Borsellino, P.C.**
***Attorneys for Plaintiff John Doe***

By: /s/ Josh Borsellino
Josh Borsellino, Esq.
Texas State Bar No. 24045532
Borsellino, P.C.
Office Address:
1020 Macon St., Suite 15
Fort Worth, Texas 76102
Mailing Address:
3267 Bee Cave Rd., Ste. 107, PMB # 201
Austin, TX 78746
Telephone: (817) 908-9861
Facsimile: (817) 394-2412
Email: josh@dfwcounsel.com